# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SEARS HOME APPLIANCES SHOWROOMS, LLC and SEARS AUTHORIZED HOMETOWN STORES, LLC, | ) ) ) ) ) |
| Plaintiffs/Counter-Defendants, | ) ) |
| v. | ) ) |
| APPLIANCE ALLIANCE, LLC, BRENT TURLEY, and MINENA TURLEY, | ) ) ) 15-cv-4414 |
| Defendants/Counter-Plaintiffs, | ) ) Judge John Z. Lee |
| v. | ) ) |
| SAMANTHA WILKS, SEARS HOLDING CORPORATION d/b/a SEARS HOMETOWN & OUTLET and SEARS.COM, and SEARS, ROEBUCK & CO., | ) ) ) ) ) ) |
| Third-Party Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Sears Home Appliances Showrooms, LLC ("SHAS") and Sears Authorized Hometown Stores, LLC ("SAHS") filed suit against Brent and Minena Turley ("the Turleys") and Appliance Alliance, LLC (together, "Defendants") for breaching the parties' franchise agreements. In turn, Defendants brought counterclaims against SHAS and SAHS, as well as Third-Party Defendants Samantha Wilks, Sears, Roebuck & Co. ("Sears Roebuck"), and an entity

Defendants named as "Sears Holding Corporation d/b/a Sears Hometown & Outlet and Sears.com"—which Plaintiffs assert are in fact two separate entities: Sears Holding Corporation ("Sears Holding") and Sears Hometown and Outlet, Inc. ("SHO").

Plaintiffs and Third-Party Defendants—whom the Court refers to collectively as Plaintiffs, for simplicity—have filed three separate motions for summary judgment. SHAS, SAHS, and SHO have moved for summary judgment on all counts of Plaintiffs' Complaint and Defendants'[1] Second Amended Counterclaim.[2] Sears Holding and Sears Roebuck, as well as Wilks, have also moved for summary judgment on all counts of Defendants' Second Amended Counterclaim, asserting the same grounds as SHAS, SAHS, and SHO, as well as additional grounds specific to each moving party.

For the reasons set forth below, SHAS, SAHS, and SHO's motion [105] is granted in part and denied in part, while Wilks' motion [103] and Sears Holding and Sears Roebuck's motion [109] are granted in full.

---

[1] The Court refers to Appliance Alliance and the Turleys throughout as "Defendants," regardless of whether the Court is discussing Plaintiffs' claims or Defendants' counterclaims.

[2] Defendants assert their counterclaims in a document titled "Second Amended Answer and First Amended Counterclaim." ECF No. 95. Defendants tendered the prior version of their counterclaims in a document titled "First Amended Answer and Counterclaim," ECF No. 44, which the Court referred to as the "First Amended Counterclaim" in a previous memorandum opinion. *See Sears Home Appliances Showrooms, LLC v. Appliance All., LLC*, No. 15-CV-4414, 2017 WL 839483, at *1 (N.D. Ill. Mar. 3, 2017). For consistency, therefore, the Court refers to the counterclaims asserted in the "Second Amended Answer and First Amended Counterclaim," ECF No. 95, as the Second Amended Counterclaim.

# Background[3]

## I.    Sears Corporate Structure

Sears Holding Corporation ("Sears Holding") was formed in 2004 through the merger of Sears, Roebuck and Co. ("Sears Roebuck") and Kmart Holding Corporation.  Sears Holding and Sears Roebuck LR 56.1(a)(3) Stmt. ("Sears Holding LR Stmt.") ¶ 9, ECF No. 111.  Sears Holding is now the parent company of Sears Roebuck.  *Id.* ¶ 11.

Sears Hometown and Outlet Stores ("SHO") was formed on October 12, 2012, when Sears Holding split off its "hometown" and "outlet" business segments from the rest of Sears.  *Id.* ¶ 19.  SHO sells home appliances, garden equipment, tools,

---

[3]    The following facts are undisputed or deemed admitted unless otherwise noted.  The Court notes that Defendants' LR 56.1(b)(3)(B) responses were frequently unresponsive to Plaintiffs' statements of fact.  *See, e.g.,* Defs.' Resp. Sears Holding and Sears Roebuck LR 56.1(a)(3) Stmt. ("Defs.' Resp. Sears Holding LR Stmt.") ¶¶ 1–5, 9–13, 15, 18–21, 23, 25, 27, 28, 30, 34, 37–39, and 41–44, ECF No. 128 (filing an identical response to 28 of 44 statements, asserting that the statement of fact "does not change the fact that all of these interrelated Sears entities are subject to common control.").  Additionally, many of Defendants' denials were made without citations to the record, as required by LR 56.1(b)(3)(B), or set forth additional, unrelated facts, *see, e.g.,* Defs.' Resp. SHAS, SAHS, and SHO LR 56.1(a)(3) Stmt. ("Defs.' Resp. SHAS LR Stmt.") ¶ 42, ECF No. 125 (discussing Sears Holding's income in response to a statement about Appliance Alliance's income).  Where Defendants' responses fail to admit or deny a statement of fact, deny a fact without reference to the record, or merely set forth additional, unrelated facts, the Court deems the original statement of fact admitted, to the extent that it offers admissible evidence and is supported by the movant's citation to the record.  *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).  Moreover, any additional, unrelated facts included in Defendants' responses are not considered.  *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005)).

    Additionally, Defendants did not file a LR 56.1(b)(3)(C) statement of additional facts, instead proffering their LR 56.1(b)(3) responses as their statements of additional facts, *see* Defs.' Resp. SHAS LR Stmt. at 74; Defs.' Resp. Sears Holding LR Stmt. at 27.  LR 56.1(b)(3)(C) "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement . . . of any additional facts that require the denial of summary judgment.'"  *Cichon*, 401 F.3d at 809 (quoting LR 56.1(b)(3)(C)).  The Court therefore does not consider Defendants' purported statements of additional facts.

and hardware. *Id.* ¶ 21. SHO is the sole member and parent company of Sears Authorized Hometown Stores, LLC ("SAHS") and Sears Home Appliance Showrooms, LLC ("SHAS"). *Id.* ¶¶ 4, 5.

## II.    Appliance Alliance Franchise Agreements

The Turleys, on behalf of the Appliance Alliance, signed four Franchise Agreements ("Agreements") with SHAS in 2010. SHAS, SAHS, and SHO LR 56.1(a)(3) Stmt. ("SHAS LR Stmt.") ¶ 8, ECF No. 107. The 2010 Agreements granted Appliance Alliance the right to operate four Sears Home Appliance Showrooms in Texas, located in Euless, Ft. Worth, Burleson, and Cedar Hill. *See id.*; *see also* Mazak Decl., Exs. 3–6, Euless, Ft. Worth, Burleson, and Cedar Hill Agreements, ECF No. 116-1. Prior to signing the 2010 Agreements, Defendants hired a franchise attorney, who conducted a comprehensive review of SHAS's Franchise Disclosure Document ("FDD"). SHAS LR Stmt. ¶ 9.

According to Brent Turley, Defendants initially decided to open an SHAS franchise "in reliance upon the representations and assurances in the Franchise Disclosure Document, the verbal statements from the Sears representative that commissions were actually averaging over [12.5] percent, the [117]-year history of Sears, Roebuck and Company, and the 'instant business' concept of the franchise in association with the Sears Kenmore brand." Turley Decl. ¶ 2, ECF No. 132. Turley claims that Defendants met twice with Russell Smith, a Sears franchise sales agent, before executing the initial Agreements, and that, in those meetings, Smith misrepresented commission rates, misled Defendants to believe that after two years

of operations Defendants would receive a 2% local marketing fee, and failed to disclose the competitive structure in which Defendants would operate. *Id.* ¶ 8.

Both the FDD and the Agreements included statements that Defendants might face competition from other Sears entities. While the FDD granted Defendants a territory in which SHAS would not license anyone to operate another Sears Home Appliance Showroom, *see* Mazak Decl., Ex. 22, May 2009 FDD at TUR00401, ECF No. 116-1, it also stated that Defendants "will not receive an exclusive territory to sell Merchandise" and "may face competition from other outlets that our affiliates own or from other channels of distribution or competitive brands that we or our affiliates own." *Id.* at TUR00402; *see also* SHAS LR Stmt. ¶ 10. The Agreements included similar language reserving SHAS's rights, on behalf of their agents and dealers, to sell Showroom merchandise online and at stores inside and outside the granted territory. SHAS LR Stmt. ¶ 17; Mazak Decl., Exs. 3–8, Euless, Ft. Worth, Burleson, Cedar Hill, Carrollton, Dallas Franchise Agreements (collectively, "Agreements") § 1.C, ECF No. 116-1.

The Agreements also specified that Defendants would receive a "variable commission rate," calculated in accordance with the Agreement, that could be modified at SHAS's discretion, although "in no event" would the "aggregate commission on the sales of Merchandise for each fiscal year during the Term be less than 9.25% of the total Net Sales of Merchandise." Agreements § 2.B(1); SHAS LR Stmt. ¶ 18. The Agreements further stated that any amounts owed to SHAS, including "payments due under any promissory note issued to our affiliate in

connection with your acquisition of the Showroom" would be deducted from commission payments, and that SHAS may "set off, to the fullest extent permitted by law, against any payment that we owe you any amounts that you owe us . . . regardless of whether we demanded payment." Agreements § 2.B(6).

In negotiating the 2010 Agreements, Defendants requested that the minimum annual aggregate commission be raised from 9.25% to 15% or 20%, but SHAS did not agree to do so. *Id.* ¶ 44. Defendants complained repeatedly about the commission rate, requesting in October 2011 that the average rate be raised to 25% and, in January 2013, requesting 19.5%. *See id.* ¶¶ 45, 46. It is undisputed that Defendants' commissions never fell below 9.25%. *Id.* ¶ 47.

In 2012, again according to Brent Turley, Defendants were specifically looking for an opportunity to open a Dallas franchise, but Sears refused to grant them the Dallas location without also requiring them to open another store in a "much less desirable location" in Carrollton. Turley Decl. ¶ 3. Ultimately, Defendants signed Agreements in 2012 to operate both the Dallas and Carrollton showrooms. SHAS LR Stmt. ¶¶ 12, 14. The 2012 Agreements, like the 2010 Agreements, included a severability and integration clause specifying that there were no other "oral or other written understandings, representations, or agreements" between SHAS and Defendants "relating to the subject matter of this Agreement." *Id.* ¶ 27.

In 2012, as in 2010, Defendants were also provided with FDDs before signing. *Id.* ¶ 15. In addition, Brent Turley signed a Representations and Acknowledgement

Statement on behalf of Appliance Alliance that represented, among other things, that Defendants' "decision to purchase the franchise has not been influenced by any oral representations, assurances, warranties, guarantees or promises whatsoever made by the Franchisor or any of its officers, employees or agents . . . including as to the likelihood of success of the franchise," and that "[n]either the Franchisor nor any of its officers, employees, or agents . . . has made a statement, promise or assurance to me concerning any matter related to the franchise . . . that is contrary to, or different from, the information contained in the [FDD]." *Id.* ¶ 16.

Defendants also signed subleases with SHAS for the Dallas and Carrollton stores. *Id.* ¶ 35. The subleases provided that, in the event of default, which included termination under § 20(c) of the Agreements, SHAS had "the immediate right to re-enter the Premises and expel" Defendants and, if that happened, Defendants "agree[d] to peacefully and quietly yield-up and surrender the Premises to [SHAS] and to immediately remove [Defendants'] personal property." *See* Mazak Decl., Ex. 17, Dallas Sublease, § 20(a)–(c), ECF No. 116-1; *id.* Ex. 18, Carrollton Sublease, § 20(a)–(c), ECF No. 116-1.

All of the Agreements—both those signed in 2010 and in 2012—included a number of additional provisions. Section 7.H required Defendants to "maintain the number of sufficiently qualified and trained staff as necessary for the proper operation of the Showroom" and be "solely responsible for their compensation." It further required that Defendants "pay . . . amounts due with respect to all amounts paid or owing to . . . [Defendants'] employees, independent contractors, creditors,

and others." Section 7.I required that Defendants acquire and maintain, at Defendants' expense, all necessary business equipment, furnishings, and office supplies, SHAS LR Stmt. ¶ 19. Section 11.B granted SHAS access to Defendants' showrooms and records and permitted SHAS to confer with Defendants' employees "for all purposes, including to determine [Defendants'] performance and observance of all of [Defendants'] obligations and conditions under this Agreement," *id.* ¶ 20. And § 11.C gave SHAS the right "to require that [Defendants] submit to [SHAS], by dates and with the frequency that [they] specify, profit and loss statements, statements of cash flow, balance sheets and other financial statements pertaining to [Defendants'] operation of the Showroom," *id.*

The Agreements also incorporated the Operations Manual ("Manual") by reference and instructed that Defendants were to "perform and observe all obligations, terms, and conditions in the Operations Manual." *Id.* ¶ 18; Agreements § 7.L. According to § 06.01.03 of the Manual, stores would occasionally be expected to participate in free delivery programs, where franchisees "may be reimbursed at a predetermined promotional rate for the free deliveries processed at the [point of sale]." SHAS LR Stmt. ¶ 34.

The parties negotiated an amendment to each of the Agreements, which stated that starting in February 2012, and for a two-year period thereafter, SHAS would withhold a marketing allowance of 2% of net sales and execute a local marketing plan for the Showroom. *Id.* ¶ 32. The amendment specified that after the two-year period, SHAS would no longer execute a marketing plan for

Defendants, at which point, as long as Defendants were in compliance with the Agreement, SHAS would provide Defendants with the marketing allowance of 2%. *Id.* The provision further stated that SHAS "may from time to time request that you prepare and submit a report to us which accounts for the manner in which you spent the Marketing Allowance" and provided that SHAS "may, at any time during the Term, elect to . . . cease providing the Marketing Allowance." *Id.*

After the two-year period, in February 2014, Defendants asked SHO[4] to stop running the local marketing for three of their stores and instead provide Defendants with the 2% marketing allowance. *Id.* ¶ 51. In response, SHO requested that Defendants provide a marketing plan setting forth how they intended to spend the allowance, and offered to provide marketing analytics to assist Defendants. *Id.* ¶ 52.

## III. Showroom Performance

According to Brent Turley, the first four Sears franchises were profitable but, over time, the profitability of all of Defendants' franchises was affected by erosion in the credibility of the Sears brand, as well as competition with other Sears entities. Turley Decl. ¶¶ 5, 6. Turley claims that Sears' restructuring forced Defendants to compete directly with Sears, including "through terminals we would be required to install in our stores that would allow our customers to see online Sears products,

---

[4]      SHAS, under its newly formed parent company SHO, was split off from Sears in 2012. *See* Sears Holding LR Stmt. ¶ 19. Plaintiffs refer to the entity engaging with Defendants variously as SHAS and SHO. The Court matches its language to those of the undisputed facts.

but prohibit us from price-matching the prices and features that Sears were offering online." *Id.* ¶ 8.

As a result of this reduction in profitability, Turley admits that Defendants "f[e]ll behind on various obligations, primarily including payroll and rent owed to landlords." *Id.* ¶ 6. According to Rudy Mazak, Vice President of Dealer and Hometown Stores at SAHS, Defendants were unable to stay current with their rent payments in September and October 2011. Mazak Decl. ¶ 29, ECF No. 107. In October 2011, Defendants decided to take a "drastic step[ ] and reassign the lease agreements back to Sears." *Id.* Ex. 40, 10/26/2011 Turley Email, at SHAS00002666.

Then, in early 2014, Defendants again fell behind on rent. At that time, SHO loaned Defendants over $44,000 to assist in meeting Defendants' rent obligation for two of their locations. SHAS LR Stmt. ¶ 57. On June 6, 2014, SHO issued a Notice of Deficiencies documenting this failure to pay rent as a "deficiency" under the Agreements and related documents. *Id.*; *see also* Mazak Decl., Ex. 53, 6/6/2014 Notice of Deficiencies at SHAS00001754–58, ECF No. 116-3. The notice informed Defendants that failure to bring their stores into compliance with the Agreements "may result" in SHO exercising its rights to terminate one or more of the Agreements. *Id.* at SHAS00001755.

In March 2015, Defendants were again behind on their rent. According to Brent Turley, Defendants had fallen behind solely because of a change in payment method. *See* Mazak Decl., Ex. 56, 4/3/2015 Turley Email at SHAS00001994, ECF No. 116-3. As Turley explained at his deposition, Sears had been paying

Defendants' rent directly to their landlords since early 2014 and taking the money out of their commissions, to ensure Defendants were current on their rent. Mazak Decl., Ex. 1, Turley Dep. at 105:1–4, ECF. No. 116-1. But the Burleson store then stopped accepting cashier's checks from SHO, and SHO informed Defendants in late November that Defendants were directly responsible for paying the December rent. *Id.* at 105:17–106:6. Turley testified that, as of March 2015, Defendants had not paid any of their rent obligations for Burleson. *Id.* at 106:7–107:15.

Meanwhile, Defendants were also struggling to pay their employees. SHAS LR Stmt. ¶ 61. Turley acknowledged in his deposition that the company "was not always current" with making payroll, as they "were a growing company." Turley Dep. at 117:11–16. Along these lines, the June 2014 Notice of Deficiencies also mentioned Defendants' failure to meet their payroll obligations to their employees in all of their stores. 6/6/2014 Notice of Deficiencies at SHAS00001758. The letter stated that Defendants were, in June 2014, "behind in payroll obligations of approximately $40,000." *Id.*

Then, on February 23, 2015, SHO sent a Notice of Default identifying Defendants' failure "to meet [their] payroll obligations as they became due." SHAS LR Stmt. ¶ 68; Mazak Decl., Ex. 57, 2/23/2015 Notice of Default at TUR02086. The Notice instructed Defendants that the default "constitute[d] violations of the Agreements and grounds for termination pursuant to Sections 1.5B(12) and 15.B(22) of the Agreements if each Default is not cured timely and in the manner outlined below." *Id.* at TUR02087. According to the Notice, to cure the default,

Defendants were required to "fulfill all payroll obligations and submit documentation evidencing that same" within 60 days.[5]  *Id*.  It is undisputed that Defendants never provided the requested documentation showing that they had fulfilled the payroll obligations.  Defs.' Resp. SHAS LR Stmt. ¶ 66.

The February 23 Notice of Default also identified as a default Defendants' "failure to comply with financial reporting requirements mandated by the operations manual"—specifically, SHAS's multiple requests to Defendants for financial statements for each of the Showrooms for 2012, 2013, and the first three quarters of 2014.  2/23/2015 Notice of Default at TUR02086.  To cure this default, the letter instructed Defendants to provide, within 60 days, financial reports including annual profit and loss statements (by location), quarterly statements of cash flows, and quarter-end balance sheets.  *Id*. at TUR02087.

SHAS reserved the right, under the Agreements, to "require that [Defendants] submit to us, by dates and with the frequency that we specify, profit and loss statements, statements of cash flow, balance sheets and other financial statements pertaining to your operation of the Showroom."  SHAS LR Stmt. ¶ 20; Agreements § 11.C.  And it is undisputed that SHO repeatedly asked Defendants for financial statements on a store-by-store basis.  *See* SHAS LR Stmt. ¶ 59.

---

[5]     Defendants object to the "conclusions" in the 2/23/2015 Notice of Default on the basis of "hearsay and lack of foundation."  Defs.' Resp. SHAS LR Stmt. ¶ 68.  Defendants have not, however, identified the specific statements in the Notice that are hearsay or lack foundation. *See id*.  In any event, the Court does not consider any of the statements in the Notices of Default for truth of the matter asserted.  *See* Federal Rule of Evidence 801(c)(2).

But as Brent Turley testified, SHO began asking for Defendants to provide previous years' financial statements, per store and per quarter, after Defendants had already provided the data from 2012, 2013, and 2014. Turley Dep. at 74:17–22. Turley stated that he did not comply with SHO's request that he provide store-by-store financial statements, both because SHO had never before made such a request and because SHO had never provided Defendants with store-by-store data for Defendants to utilize. *Id.* at 75:3–22.

Defendants and SHO also had a dispute about store hours. Both the Agreements and the Manual specified requirements for the operating hours of the showrooms. The Agreements required Defendants to "maintain regular days of operation and business hours" that SHAS specified and to "extend the days of operation and business hours" at SHAS's request. Agreements § 7.E. Section 1.01 of the Manual further dictated that, if for any reason the store could not open on time or needed to close early, the Franchisee was to notify the District Manager immediately. SHAS LR Stmt. ¶ 34.

On several occasions in 2015, Defendants operated their stores on more limited hours than those designated in the Manual, by opening late and closing early.[6] SHAS LR Stmt. ¶ 54. According to Defendants, the only days on which the stores opened late were "ice storm days during the winter." Defs.' Resp. SHAS LR Stmt. ¶ 54. But according to District Manager Samantha Wilks, Appliance Alliance

---

[6] While Defendants dispute certain aspects of SHAS LR Stmt. ¶ 54, they do not dispute that the Appliance Alliance stores opened late several times in 2015. *See* Defs.' Resp. SHAS LR Stmt. ¶ 54.

stores opened late without communicating to Wilks. *See* Wilks Decl. ¶¶ 1, 3, ECF No. 113. Wilks further stated that later the same day, Brent Turley informed her that the stores would be closing early, and when Wilks stated that she would send up for approval, Turley told Wilks that "this was not a request, he was going to close at 6:00 p.m." *Id.* ¶ 5. Wilks testified that Defendants also had failed to notify her in advance when stores opened late again on March 5, 2015. *Id.* ¶ 7.

Meanwhile, as Defendants saw it, Wilks had been "taking over management control of [Defendants'] employees." Turley Decl. ¶ 11. Turley states that Wilks, who took on the role of District Sales Manager in January 2015, was supposed to train Defendants' employees. *Id.* ¶ 13. Instead, Turley claims Wilks called all of Defendants' stores every day to speak with the employees. *Id.* ¶ 14. She told the employees to contact her instead of Defendants if they had questions or issues, a practice which Turley told her to stop, but she continued doing. *Id.* According to Turley, Wilks also directed employees to provide "free" delivery to some customers, against Defendants' wishes, *id.*, and gave employees and managers directions as to store hours and operating procedures, *id.* ¶ 16.

## IV. Termination

Section 15.B of the Agreements allowed SHAS to terminate the Agreements if Defendants did any of the following: "take any action in furtherance of abrogation, disaffirmance, or repudiation of the Agreement or of any of your obligations under the Agreement," § 15.B(5); "fail to pay your obligations as they become due," § 15.B(12); fail to perform a term, condition, or other obligation in a loan agreement or lease, "including a lease for the Sears Home Appliance Showroom," 15.B(13); or

"default in the performance or breach of (i) any other agreements with us or our affiliates, including agreements for or related to another Sears Home Appliance Showroom," § 15.B(16). Section 15.B also allowed SHAS to terminate the Agreements if SHAS "issue[s] three or more notices of default of provisions of this Agreement within a 12-month period, regardless of whether the defaults were cured," § 15.B(19). SHAS LR Stmt. ¶ 21.

Upon termination, § 15.C required that Defendants pay "all amounts owed under" the Agreements. *Id.* ¶ 22. The Agreements further provided SHAS with the option ("purchase option") upon termination to "purchase any or all of the furniture fixtures, equipment and leasehold improvements used in the operation of the Showroom" and "assume the Lease," § 15.E. *Id.* ¶ 23. During the period of time that SHAS was allowed to consider exercising the purchase option, SHAS was allowed to operate the showrooms and use Defendants' property, "without charge and without any compensation" to Defendants. *Id.* ¶ 24. The Agreements also included a provision granting SHAS a security interest in all assets of the showrooms. *Id.* ¶ 30. Finally, the Agreements specified a calculation for liquidated damages in the event that any of the Agreements were terminated because of Defendants' default. *Id.* ¶ 26.

On April 13, 2015, SHO sent Defendants Notices of Default and Termination for all six of Defendants' franchises.[7] SHAS LR Stmt. ¶ 69; Mazak Decl., Ex. 62,

---

[7] Defendants broadly object to the "contents" in the Notices of Default and Termination as "based upon hearsay." Defs.' Resp. SHAS LR Stmt. ¶ 69. Defendants have not, however, identified the specific statements in the Notices that are hearsay or lack

Default and Termination Letters, ECF No. 116-3. The Notices stated that SHO was "terminating the Franchise Agreements effective as of April 16, 2015 at end of the business day." *Id.* They identified defaults at all six of the stores, including failure to pay rent to Defendants' landlord under their lease for the Burleson store, failure to open all six stores during the business hours designated by SHO, and failure to comply with brand standards for store appearance. *Id.* The notice also informed Defendants that it was the third notice of default sent in a twelve-month period and that, pursuant to the Agreements, SHO had the right to terminate the Agreements on that basis. *Id.*

Defendants previously had executed several promissory notes to SAHS, for a total of $1,344,297.06, in connection with the purchase of their franchises. *Id.* ¶ 37. The promissory notes provided that SAHS was authorized to "deduct the amount of each Installment from Commissions owed to [Defendants] under the Franchise Agreements and to pay such amounts to the Company." *Id.* ¶ 38. The notes also provided that amounts become immediately due and payable upon "the termination of any of the Franchise Agreements for any reason." *Id.*

Defendants stopped making payments on the promissory notes following their termination as franchisees. According to Plaintiffs, Defendants still owe $878,346 in principal, plus accrued interest. *Id.* ¶ 40. Brent Turley acknowledged in a deposition that Defendants still owed "approximately $800,000" at the time of

---

foundation, *see id.,* and, in any event, the Court does not consider any of the statements in the Notices for truth of the matters asserted therein.

termination on April 15, 2015, *see* Turley Dep. at 145:2–15, and that Defendants had not made further payments under the promissory note, *id.* at 144:5–21.

## V.    Post-Termination Events

It is undisputed that, on April 15, 2015, Brent Turley gave an SHO employee the keys to all of Defendants' stores.  SHAS LR Stmt. ¶ 72.  Turley claims that Wilks then "personally supervised and directed the lockout of [Defendants] from all six of our stores, and thereafter had the locks changed to prevent our access." Turley Decl. ¶ 17.

Within a month of termination, SHO conducted inventories of the merchandise and closed the Cedar Hills, Burleson, and Ft. Worth locations.[8]  SHAS LR Stmt. ¶ 73.  SHO then entered into an occupancy agreement with the landlord for the Euless location to operate the store for three months.  *Id.* ¶ 74.  SHO took over and continued the operations of the Dallas and Carrollton locations.  *Id.* ¶ 75.

On April 20, 2015, Minena Turley asked SHAS employee Rudy Mazak when to expect a final commission statement.  *Id.* ¶ 76.  Mazak responded that, pursuant to the Franchise Agreements, SHO had sixty days to perform full account reconciliation.  *Id.*

On May 8, 2015, Defendants filed a lawsuit in Texas state court.  *Id.* ¶ 78. According to Defendants, they filed the lawsuit and requested a temporary

---

[8]    Defendants assert that they lack knowledge to respond to this statement, as well as others. *See, e.g.,* Defs.' Resp. SHAS LR Stmt. ¶¶ 73, 74.  Plaintiffs' statements are therefore deemed admitted, as "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."  LR 56.1(b)(3)(C).

restraining order in an attempt to recover their property.  *See* Defs.' Resp. SHAS LR

Stmt. ¶ 78.  It is undisputed that they did not make any other attempt to recover

their property, SHAS LR Stmt. ¶ 78;  Turley Dep. 134:15–21, and that, on May 20,

2015, SHO's attorney informed Defendants' attorney that SHO was leaving

property owned by Defendants in four of the stores, SHAS LR Stmt. ¶ 77.  As for the

property in the remaining two stores, SHO's attorney informed Defendants'

attorney that SHO had a security interest in the stores' furniture and equipment,

and sought to "negotiate for the [furniture and equipment] via setoff from amounts

owing to SHO."[9] *Id.*

According to Defendants, they never received a final accounting of the

commissions they were owed, which Brent Turley estimates is at least $75,000.

Turley Decl. ¶ 22.

In their complaint, Plaintiffs allege that Defendants breached the

Agreements (Count I) and the promissory notes (Count II).  Plaintiffs also seek

declaratory judgment, pursuant to 28 U.S.C. § 2201 *et seq.*, that SHAS properly

terminated the Agreements and is not liable for any of the claims raised in

---

[9]     Defendants assert that this statement constitutes settlement discussions inadmissible under Federal Rules of Evidence 408.  But while Rule 408 bars admission of evidence of an offer for valuable consideration in compromising or attempting to compromise a claim, such evidence is only inadmissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  Fed. R. Evid. 408(a).  The Court interprets Plaintiff not as tendering this evidence to disprove the validity or amount of a disputed claim, or to impeach, but instead to assert that, in fact, Plaintiffs communicated to Defendants about Defendants' property left behind in their stores.

Defendants' Texas action (Count III), as well as an award of reasonable attorneys' fees pursuant to provisions in the promissory notes and Agreements (Count IV).

Defendants, in turn, filed the following counterclaims against SHAS, SAHS, Sears Roebuck, Sears Holding, and SHO: breach of contract (Count I); conversion and trespass (Count II); tortious interference with contract and existing business relations (Count III); defamation, business disparagement, and unfair competition (Count IV); economic duress and business coercion (Count V); violations of the Texas Business Opportunity Act and Texas Deceptive Trade Practices Act (Count VI); and fraud (Count VII). Defendants also assert Counts II, III, IV, and V against Wilks.

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. (Rule) 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785,

794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

Moreover, Rule 56 "requires the district court to grant a motion for summary judgment after discovery 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 743 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 322. Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. See *id*. at 321–22.

## Analysis

SHAS, SAHS, SHO, Sears Holding, Sears Roebuck, and Wilks move for summary judgment as to all of Plaintiffs' claims and Defendants' counterclaims. For the reasons described below, the Court grants summary judgment on Plaintiffs' Count III as to whether Plaintiffs properly terminated the Franchise Agreements, but denies it to the extent that they are seeking an order declaring their rights in the Texas action. The Court also grants Plaintiffs' motions in full as to Defendants' counterclaims and Counts I and II of Plaintiffs' complaint. Finally, the Court denies summary judgment as to Count IV of the Complaint.

# I. Plaintiffs' Claim for Declaratory Judgment on Wrongful Termination (Count III)

Plaintiffs move for summary judgment on Count III, in which they seek a declaration that SHAS properly terminated the Franchise Agreements.[10]  According to Plaintiffs, Defendants repeatedly and materially breached the Franchise Agreements by failing to do the following: timely pay rent, meet payroll obligations, provide Plaintiffs with requested financial reports, cure such failures after being notified of default, and observe store hours as designated by Plaintiffs.  Plaintiffs further contend that termination was proper under the Agreements because they provided Defendants with three notices of default in regards to these breaches.  *See* Pls.' Mem. Supp. SHAS Mot. Summ. J. ("Pls.' Mem.") at 1–4, ECF No. 106.  In response, Defendants argue only that any breaches by Defendants were excused by Plaintiffs' prior material breaches, thereby rendering any termination unjustified.  *See* Defs.' Mem. Opp. SHAS Summ. J. ("Defs.' Mem.") at 11, ECF No. 124.

---

[10]     Count III also asserts a claim for declaratory judgment that Plaintiffs are not liable for any of the claims raised in a related Texas state court action.  But while Plaintiffs purport to move for summary judgment on all the claims in their complaint, *see* SHAS Mot. Summ. J. at 1, ECF No. 105, Plaintiffs do not reference the Texas action anywhere in their briefing, and the Court therefore concludes that Plaintiffs do not seek summary judgment on that issue.  In any event, whether this Court can (or should) dictate the findings of a Texas state court is highly questionable.  *See SKS & Assocs., Inc. v. Dart*, 619 F.3d 674, 679 (7th Cir. 2010) (explaining that granting a party's request "to have a federal court tell state courts" how and when to decide a category of cases "would reflect a lack of respect for the state's ability to resolve the cases properly before its courts.").

## A.  Grounds for Termination

When interpreting contracts, the primary objective of Illinois[11] courts is to give effect to the intent of the parties.  *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 792 (7th Cir. 2014) (citing *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999).  "If a contract is clear and unambiguous, the court must determine the intent of the parties solely from the plain language of the contract."  *Id*.  Here, the grounds for termination in the Agreements are clear and unambiguous, and Defendants do not challenge the plain language of the provisions.  It is clear from a review of the relevant provisions that Plaintiffs had multiple grounds for terminating Defendants.

First, § 15.B(13)(B) of the Agreements states that SHAS is entitled to terminate Defendants if they fail to perform a term, condition, or other obligation in

---

[11]     The Agreements included a choice-of-law provision that specified Illinois law.  SHAS LR Stmt. ¶ 7.  Both sides assume that Illinois law governs the contract claims in this case, *see* Pls.' Mem. at 2 n.1; Defs.' Mem. at 10–11, although Defendants also assert in their LR 56.1(b)(3) statement that they did "not willingly agree" to the choice-of-law provision.  *See* Defs.' Resp. SHAS LR Stmt. ¶ 7.  Defendants do not pursue this argument in their memorandum opposing summary judgment, nor do they provide any evidence supporting a finding that the choice-of-law provision was imposed against their will.  *See generally* Defs.' Mem.  But, to the extent that Defendants seek to challenge the choice-of-law provision, the Court notes that under Illinois law, "[a] forum-selection clause in a contract is *prima facie* valid and should be enforced unless the opposing party shows that enforcement would contravene the strong public policy of the State in which the case is brought or that the chosen forum would be seriously inconvenient for trial."  *Maher and Assoc., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1004 (Ill. 1994).  Accordingly, the Court will apply Illinois law as contemplated by the Agreements.

   Similarly, the parties both assume—as they did at the motion-to-dismiss stage, *see Appliance All*., 2017 WL 839483, at *6—that Texas law applies to the tort law claims.  *See* Defs.' Mem. at 20–24; Pls.' Mem. at 7 n.4, 8 n.5, 9 n.7, 12 n.9.  The Court therefore applies Texas law to the tort claims.  *See Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." (citation and quotation marks omitted)).

a loan agreement or lease, "including a lease for the Sears Home Appliance Showroom." It is undisputed that Defendants fell behind on rent. *See* SHAS LR Stmt. ¶ 57 (Defendants were behind on rent in early 2014 and SHO loaned them over $44,000 to assist in meeting their rent obligations); Turley Dep. at 106:7–107:15 (Defendants were several months behind in rent at their Burleson location in March 2015). It is further undisputed that Defendants failed, several times, to timely pay their employees and that, when notified that such failure was a default, did not cure such default within the required time period. *See* Turley Dep. at 117:11–16 (acknowledging the company was not always current on payroll); June 2014 Notice of Deficiencies (noting that Defendants were $40,000 behind in payroll obligations); SHAS LR Stmt. ¶ 66 (Defendants did not provide documentation that they had cured the default of failing to timely pay their employees). This provided two more grounds for termination under § 15.B(12) and § 15.B(22) of the Agreements. *See* Agreements § 15.B(12) (stating that SHAS is entitled to terminate the Agreements if Defendants "fail to pay their obligations as they become due."); Moreover, § 15.B(16) of the Agreements entitled Plaintiffs to terminate all Agreements if Defendants defaulted or could be terminated pursuant to another Agreement. As such, Plaintiffs were entitled, under the plain language of the Agreements, to terminate all six Agreements for failure to pay rent and payroll alone, as well as for the issuance of three notices of default in a twelve-month period. *See* Agreements § 15.B(19); SHAS LR Stmt. ¶ 21.

## B.     Prior Material Breaches by Plaintiffs

Defendants contend that termination was unjustified because Defendants' breaches were excused by Plaintiffs' prior material breaches.  *See* Defs.' Mem. at 11. As far as the Court can tell,[12] Defendants argue that Plaintiffs committed the following prior material breaches: (1) forcing Defendants to compete with other Sears-branded entities; (2) failing to pay commissions as promised; (3) shifting costs on Defendants for "free delivery" promotional offers and office supplies; (4) refusing to pay Defendants the 2% marketing fee; (5) "arbitrar[il]y charging [ ] unexplained charges to the bimonthly distributions" to Defendants; (6) altering the required hours for Defendants to stay open; and  (7) "fail[ing] to deal with the Turleys in good faith."  *See* 2d. Am. Countercl. ¶ 41 (referencing *id.* ¶¶ 17–37); Defs.' Mem. at 10–11.

But Defendants fail to present any evidence that Plaintiffs committed these proposed breaches prior to terminating the Agreements.  First, Defendants' claim that Plaintiffs breached the Agreements by forcing Defendants to compete with other favorably positioned Sears entities finds no support in the FDD and the Agreements, both of which warned Defendants, in unambiguous terms, that they might face competition from other Sears entities.  For instance, the FDD explained that Defendants "will not receive an exclusive territory to sell Merchandise" and "may face competition from other outlets that our affiliates own or from other channels of distribution or competitive brands that we or our affiliates own."  2009

---

[12]     The Court considers those breaches alleged by Defendants in their counterclaim for breach of contract, as well as those raised in Defendants' memorandum opposing summary judgment.

FDD at TUR00402; *see also* SHAS LR Stmt. ¶ 10. The Agreements include similar language reserving SHAS's rights, on behalf of their agents and dealers, to sell Showroom merchandise online and at stores and centers within and outside of the granted territory. Agreements § 1.C. Defendants do not provide any evidence of competition that exceeded the scope of the competition permitted in the FDD and the Agreements.

As for whether Plaintiffs breached the contract by failing to pay commissions as promised, the undisputed evidence is that the Agreements promised only to pay commissions at a rate of at least 9.25%, Agreements § 2.B(1), and Defendants' commissions were always above 9.25%, SHAS LR Stmt. ¶ 47. For their part, Defendants assert that, before they signed the Agreements, a Sears representative had told them that commissions were averaging 12.5%. *See* Turley Decl. ¶ 2. But by signing the Agreements, Defendants agreed that there were no other "oral or other written understandings, representations, or agreements" between SHAS and Defendants "relating to the subject matter of this Agreement," SHAS LR Stmt. ¶ 27. Accordingly, any evidence of statements made during the negotiation of the Agreements is barred by the parol-evidence rule, which excludes evidence of prior or contemporaneous agreements within the scope of a fully integrated written contract. *Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*, 794 F.3d 666, 673 (7th Cir. 2015) (applying Illinois law); *see also Procaccio*, 794 F.3d at 673 (holding that language in a contract that "the only agreements related to this [contract] are stated in this policy" indicated a fully integrated contract).

Defendants next contend that Plaintiffs breached the Agreements by shifting costs for "free delivery" promotional offers and office supplies onto Defendants. According to § 06.01.03 of the Manual, stores are expected to participate, "from time to time," in free delivery programs, where franchisees "may be reimbursed at a predetermined promotional rate for the free deliveries processed at the [point of sale]." SHAS LR Stmt. ¶ 34. It is undisputed that SHO provided some reimbursements for free delivery, *see id.* ¶ 49, but Defendants contend that Sears' policy changed over time and that "in the later years the reimbursements were severely limited or non-existent." Defs.' Resp. SHAS LR Stmt. ¶ 49. Defendants, however, point to no evidence supporting this assertion, and even if they did, the Manual informs franchisees that they are expected to participate in free delivery offers, and states only that they "may" be reimbursed. As for office supplies, § 7.1 of the Agreements provides that Defendants "acquire and maintain" office supplies at their expense. SHAS LR Stmt. ¶ 19. Thus, Defendants have failed to present any evidence that Plaintiffs breached the contract by shifting costs for promotional offers or office supplies onto Defendants.

Defendants also argue that Plaintiffs breached the Agreements by refusing to pay Defendants a 2% marketing fee. The parties had negotiated an amendment to the Franchise Agreements that specified that, for two years starting in February 2012, SHAS would withhold a marketing allowance of 2% of net sales and execute a local marketing plan for Defendants. *Id.* ¶ 32. The amendment provided that after the two-year period, SHAS would no longer execute a marketing plan for

Defendants, at which point, as long as Defendants were in compliance with the Agreements, SHAS would provide Defendants with the marketing allowance of 2%. *Id.* The provision also allowed SHAS to "at any time during the Term, elect to . . . cease providing the Marketing Allowance." *Id.*

According to the undisputed evidence, after the two-year period expired, Defendants asked SHO to stop running local marketing for three of its stores and instead provide Defendants with the 2% marketing allowance, *id.* ¶ 51. SHO responded by requesting that Defendants provide a marketing plan setting forth how it intended to spend the marketing allowance. *Id.* ¶ 52. Defendants never provided the marketing plan, and SHO did not pay them the marketing allowance. *Id.* ¶ 53. Defendants now contend that the Agreements did not require Defendants to provide a marketing plan, *see id.*, but that is immaterial—the Agreements permitted SHO to stop providing the marketing fee for any reason. *See id.* ¶ 32. Therefore, if SHO wished to condition its provision of the marketing fee on the submission of a marketing plan, it was entitled to do so.

Defendants also claim that Plaintiffs breached the Agreements by altering the required hours for Defendants to stay open. Defendants do not present any evidence supporting this contention, but even if they had, it is undisputed that the Agreements required Defendants to "maintain regular days of operation and business hours" specified by SHAS and "extend the days of operation and business hours" at SHAS's request. Agreements § 7.E. And as for Defendants' claim that

Plaintiffs arbitrarily charged unexplained charges to the bimonthly distributions paid to Defendants, Defendants have identified no evidence of any such charges.

Defendants' claim that Plaintiffs failed to deal with Defendants in good faith also fails. Under Illinois law, "the implied covenant of good faith" requires that a controlling party "exercise [its] discretion reasonably and with proper motive, and . . . not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992) (citing *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 972 (Ill. App. Ct. 1984)). Here, Defendants have pointed to no evidence indicating that SHO's decision to terminate the Agreements, after multiple incidences of non-payment to employees and landlords, was arbitrary, capricious, or inconsistent with the parties' reasonable expectations.

Finally, as for Defendants' contention that Plaintiffs improperly interfered with Defendants' contractual relations, Defendants present no evidence that Plaintiffs exceeded the scope of their contractual role in interacting with Defendants' employees or landlords prior to termination.[13] And while Defendants contend that Wilks interfered with their relationship with their employees by communicating directly with Defendants' employees, § 11.B of the Agreements granted SHAS access to Defendants' showrooms and records and allowed SHAS to confer with Defendants' employees "for all purposes, including to determine

---

[13]    To the extent that Defendants claim that Plaintiffs breached the Agreements by interfering with Defendants' contractual relationships with their employees and landlords *after* termination, the Court examines that argument *supra*.

[Defendants'] performance and observance of all of [Defendants'] obligations and conditions under this Agreement."

Because the undisputed evidence demonstrates that Plaintiffs had grounds to terminate Defendants under the Agreements, and because Defendants have failed to present any evidence of a prior material breach by Plaintiffs, the Court concludes that there is no triable issue of fact as to whether Plaintiffs properly terminated the Agreements with Defendants. The Court therefore grants summary judgment to Plaintiffs on this aspect of Count III of Plaintiffs' complaint and declares that SHAS properly terminated its relationship with Defendants pursuant to the Franchise Agreements.

## II.    Plaintiffs' Claim for Breach of the Agreements (Count I)

As described above, Plaintiffs claim that Defendants breached the Agreements when they failed to do each of the following: timely pay rent, meet payroll obligations, provide Plaintiffs with requested financial reports, cure such failures after being notified of default, and observe store hours as designated by Plaintiffs. While the Court has already found that Plaintiffs had grounds to terminate the Agreements, it has not analyzed whether those grounds—or other actions or inactions by Defendants—qualify as contract breaches under Illinois law. To prevail on a breach of contract claim, Plaintiffs must prove "(1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach." *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 626 (7th Cir. 2013) (quoting *Law Offices of Colleen M. McLaughlin v. First Star Fin. Corp.*, 963 N.E.2d 968, 981 (Ill. App. 2011)). Only a

duty imposed by the terms of a contract can give rise to a breach. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004) (citing *Gallagher Corp. v. Russ*, 721 N.E.2d 605 (Ill. App. Ct. 1999)).

Here, the existence of the contract is not in dispute, and the Court has already concluded that Defendants failed to present any evidence of prior material breaches by Plaintiffs. The relevant question then is whether the Agreements imposed any duties that Defendants failed to fulfill.

Plaintiffs contend that Defendants breached the Agreements by failing to timely pay rent and payroll. Section 7.I required Defendants to be "solely responsible for . . . operating costs and expenses of the Showroom, including rent," while § 7.H required them to "maintain the number of sufficiently qualified and trained staff as necessary for the proper operation of the Showroom" and be "solely responsible for their compensation." Section 7.H further specified that Defendants must "pay . . . amounts due with respect to all amounts paid or owing to . . . [Defendants'] employees, independent contractors, creditors, and others."

As noted *supra*, it is undisputed that Defendants failed, several times, to timely pay their employees, *see, e.g.,* Turley Dep. at 117:11–16 (acknowledging the company was not always current on payroll), as well as to timely pay rent, *see, e.g, id*. at 106:7–107:15 (Defendants were several months behind in rent at their Burleson location in March 2015). There is therefore no material dispute of fact that Defendants breached § 7.H of the Agreements by failing to pay amounts due to employees and to landlords, and § 7.I by failing to pay rent for the Showrooms.

It is also undisputed that Defendants failed to provide store-by-store financial statements as requested by Plaintiffs. *See* Turley Dep. at 75:3–22; SHAS LR Stmt. ¶ 59. Plaintiffs argue that by failing to provide such information, Defendants breached § 11.C of the Agreements, which reserved for SHAS the right to require Defendants to submit, "by dates and with the frequency that [SHAS] specif[ies], profit and loss statements, statements of cash flow, balance sheets and other financial statements pertaining to your operation of the Showroom." SHAS LR Stmt. ¶ 20. Defendants disagree, contending that store-by-store requests were unreasonable, given that Defendants had already provided Plaintiffs with the (non-store-specific) data. *See* Turley Dep. at 74:17–22. But the Agreements included no such limiting language, and given that the Agreements were signed on a store-by-store basis, SHAS was well within its rights to request the financial data for each store pursuant to the Agreement that applied to that particular store. The Court therefore finds that no reasonable jury could conclude that Defendants did not breach § 11.C.

Finally, Plaintiffs contend that Defendants violated certain provisions in the Agreements and Manual that required Defendants to maintain business hours according to SHAS specifications and notify SHAS's district manager immediately if the store could not open on time. *See* Agreements § 7.E ("You will maintain regular days of operation and business hours that we specify."); Manual § 1.0.1 ("If for any reason the store cannot open on time, or must close early due to inclement weather, etc., the Franchisee must notify the District Manager immediately."). It is

undisputed that, on several occasions in 2015, Defendants operated their stores on more limited hours than those designated in the Manual. SHAS LR Stmt. ¶ 54. And Wilks states that, on multiple occasions, Defendants failed to notify her in advance of deviations from normal business hours. *See* Wilks Decl. ¶¶ 1, 3, 7.

Defendants do not dispute Wilks' statements. Instead, they argue that deviations from standard hours were driven by concerns for employee safety during adverse weather conditions. *See* Turley Decl. ¶ 15. But Defendants point to no provision in the contracts that would justify a failure to inform the district manager in such instances, and the Manual specifically requires 'immediate" notice if a store "must close early due to inclement weather." Manual § 1.01. As such, the Court finds that there is no material dispute of fact that Defendants breached the Agreements and Manual as related to store hours.

For these reasons, the Court grants Plaintiffs' motion for summary judgment as to their breach of contract claim.

## III.  Counterclaim for Breach of Contract and Wrongful Termination (Count I)

In Count I of Defendants' counterclaim, Defendants allege that Plaintiffs breached the Agreements and wrongfully terminated Defendants. The Court has already found that Plaintiffs had grounds to terminate Defendants under the contract and that Defendants failed to present any material evidence of a breach prior to termination. Defendants also contend, however, that Plaintiffs breached the Agreements *after* termination by "fail[ing] to return the Turleys' property to

them or to tender an offer to purchase as required by the contracts."[14]  Defs.' Mem.

at 10–11.  Defendants do not indicate which provision they believe imposes such

requirements, although § 15.E of the Agreements provides SHAS with the option

upon termination to "purchase any or all of the furniture fixtures, equipment and

leasehold improvements used in the operation of the Showroom."  SHAS LR Stmt.

¶ 23.  In any event, it is undisputed that SHO informed Defendants that their

property was being left behind in four stores and offered to negotiate for the value of

the property in the remaining two stores, *see id.* ¶ 77, and Plaintiffs have failed to

adduce any evidence in support of a claim that § 15.E was breached, if indeed that

is their claim.  *See Celotex*, 477 U.S. at 322 .

　　As Defendants have failed to provide evidence of any breaches, pre- or post-

termination, and the Court has already found that the termination was justified,

summary judgment is granted to Plaintiffs as to Defendants' counterclaim for

breach of contract and wrongful termination.

## IV.　Plaintiffs' Claim for Breach of Promissory Notes (Count II)

　　Plaintiffs also move for summary judgment on Count II of the complaint,

contending that the undisputed evidence shows that Defendants breached their

---

[14]　In its counterclaim for breach of contract, Defendants also describe a series of alleged wrongs committed against them by Plaintiffs that sound in tort rather than contract, and are encompassed by Defendants' other counterclaims.  *See* 2d. Am. Countercl. ¶ 42 (alleging how Plaintiffs "trespassed," "unlawfully converted and appropriated the personal property" of Defendants, "tortiously interfered with the contractual relationship" between Defendants and their employees, and "misappropriated and t[ook] monies" belonging to Defendants).  Because these wrongs are later asserted as independent counterclaims, *see* Counts II–V, and because Defendants point to no related obligations in the Agreements, the Court does not construe this additional list of wrongs as alleged breaches of contract.

promissory notes with SAHS by failing to pay all amounts outstanding upon the termination of the Agreements.

To recover on a promissory note under Illinois law, a plaintiff must show that "(1) a defendant executed the promissory note; (2) the plaintiff is the holder of the note; and (3) the defendant has no viable defense in order to recover on a promissory note." *Bank of New York Mellon v. Murillo*, No. 12-CV-6726, 2014 WL 773041, at *2 (N.D. Ill. Feb. 25, 2014).

Here, it is undisputed that Defendants executed the promissory notes, *see* SHAS LR Stmt. ¶¶ 37, 41, and that SAHS is the holder of the note, *see id.* ¶ 40. Brent Turley also acknowledged that, as of termination on April 15, 2015, Defendants still owed "approximately $800,000" on the promissory notes, *see* Turley Dep. at 145:2–15, and that they had not made further payments under the notes since termination, *id.* at 144:5–20.

Defendants, who have combined their responses to Plaintiffs' two breach counts in one section, *see* Defs.' Mem. at 10–11, appear to contend that the same alleged prior material breaches that justified their breaches of the franchise agreements again justify the nonpayment of the promissory note, *see id.* But the Court has already found that no reasonable factfinder could determine that Plaintiffs breached the contract with Defendants as they claim. The Court therefore grants summary judgment to Plaintiffs on this count.

**V.    Counterclaims for Conversion and Trespass (Count II), Defamation and Business Disparagement (Count IV), and Fraud (Count VII)**

In Count III, Defendants allege that Plaintiffs trespassed on Defendants' property by locking Defendants out of premises to which Defendants had lawful possession, and converted Defendants' personal property to Plaintiffs' own use and benefit by not following the Agreements' post-termination procedures. Defendants further allege that Plaintiffs converted Defendants' final commission distributions. *See* 2d. Am. Countercl. ¶¶ 51, 52. In Count IV, Defendants claim that Wilks and other Sears employees defamed and disparaged Defendants and their business by spreading allegations that Defendants had failed to honor their business obligations and had breached their contracts with Sears. *Id.* ¶ 65. And in Count VII, Defendants claim that Plaintiffs committed fraud by materially misrepresenting potential profits to be earned by franchisees, as well as failing to disclose other conditions that created lower profits for Defendants. *Id.* ¶ 88. Plaintiffs now move for summary judgment on these counterclaims.

First, Plaintiffs argue that, because Defendants do not acknowledge the existence of the counterclaims in their memorandum opposing summary judgment, let alone address Plaintiffs' arguments, Defendants have waived the claims. Pls.' Reply Br. at 1, ECF No. 135. The Court agrees. *See De v. City of Chi.*, 912 F.Supp.2d 709, 733 (N.D. Ill. 2012) ("[I]t is a well-settled rule that a party opposing summary judgment must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered . . . . If the opposing party fails to do so, the claim is deemed waived and the nonmoving party will lose the motion."

(internal citations omitted)). The Court finds that Defendants have waived their counterclaims for conversion, trespass, defamation, business disparagement, and fraud. Accordingly, the Court grants summary judgment to Plaintiffs as to Counts III and VII, and as to the defamation and business disparagement claims in Count IV.

## VI. Counterclaim for Tortious Interference with Contract and Existing Business Relations (Count III)

Plaintiffs move for summary judgment as to counterclaim Count III, in which Defendants allege that Plaintiffs interfered with valid and enforceable contracts between Defendants and their landlords and ongoing and profitable business relationships with their vendors and employees. 2d. Am. Countercl. ¶¶ 56, 57. Specifically, Defendants contend that Sears had the contractual option to assume the leases, but not to "exclude [Defendants] from leased premises for which they were the only lawful tenants," which in turn resulted in Defendants breaching their leases. Defs.' Mem. at 23. Defendants further believe that Wilks interfered in Plaintiffs' business relationship with their employees by usurping the Turleys' ability to direct and manage their own employees. *See id.*

To prevail on a claim for tortious interference with contractual relations under Texas law, Defendants must prove: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) and actual damages. *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 774 (S.D. Tex. 2010) (citing *Specialties of Mex. Inc. v. Masterfoods USA*, No. L-09-88, 2010 WL 2488031, at *9 (S.D. Tex. June 14, 2010)). If, however, a party acts in the bona fide exercise of its own rights, a party

is privileged to interfere in the contractual relations of another. *Guardian Life Ins. Co. v. Kinder*, 663 F. Supp. 2d 544, 557 (S.D. Tex. 2009) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000)).

According to Plaintiffs, Defendants' claims for tortious interference with contractual relations cannot survive summary judgment because, to the extent that Plaintiffs interfered with Defendants' leases, Plaintiffs were exercising their own rights under the Agreements. Pls.' Reply at 12–13. The Court agrees.

The Court has already found that Plaintiffs properly terminated Defendants under the Agreements. Moreover, it is undisputed that Plaintiffs had the right under the Agreements to operate the Showrooms and use Defendants' property while determining whether Plaintiffs intended to exercise the option to purchase Defendants' property after termination. SHAS LR Stmt. ¶ 23 (citing Agreements § 15.E). The undisputed evidence indicates that Plaintiffs exercised that right: they closed three stores within a month of termination and entered into an occupancy agreement with the landlord for the Euless location to operate the store for three months. *See id.* ¶¶ 73, 74. As for the Dallas and Carrollton stores, the undisputed facts demonstrate that SHAS had signed subleases with Defendants for those stores and that those subleases provided that, in the event of termination, § 20(c), SHAS had the right to re-enter and expel Defendants and that Defendants would surrender the premises. *Id.* ¶ 35; *see also* Dallas Sublease, § 20(a)–(c), Carrollton Sublease, § 20(a)–(c). Defendants have failed to point to any specific

instances where Plaintiffs "interfered" with Defendants' contracts in a way that was not permitted under the Agreements or subleases.

While Defendants are correct that the purchase option allowed Plaintiffs the right to assume the leases, it was only an option. Defendants point to nothing mandating that Plaintiffs assume the leases. *See generally* Agreements § 15.E. And other than Defendants' contention that Plaintiffs changed the locks to the Showrooms during the month Defendants were occupying them, *see* Turley Decl. ¶ 17, Defendants have not offered any evidence that Plaintiffs "excluded" Defendants from the leased premises after Plaintiffs stopped operating four of the stores. In fact, Brent Turley admitted that Defendants did not seek access to their property in the stores other than through filing the lawsuit in Texas state court. Turley Dep. at 134:15–21. Because Defendants have not presented evidence of Plaintiffs' exceeding the scope of those contractual rights, Defendants' claim for tortious interference of contract fails. *See Kinder*, 663 F. Supp. 2d at 557.

As for the claim of tortious interference with existing business relations, to prevail on such a claim under Texas law, Defendants must prove that Plaintiffs undertook unlawful actions without justification or excuse, and with intent to harm, which caused actual damages. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 633–34 (5th Cir. 2002) (citing *Morris v. Jordan Fin. Corp.*, 564 S.W.2d 180, 184 (Tex. Civ. App. 1978)). According to Defendants, Wilks interfered with their relationship with their employees by communicating directly with their employees.

But § 11.B of the Agreements authorized SHAS to confer with Defendants' employees "for all purposes, including to determine [Defendants'] performance and observance of all of [Defendants'] obligations and conditions under this Agreement." Defendants have not cited to any evidence that Wilks' communications went beyond the broad scope granted by the Agreements, and what is more, they point to no evidence that any such communications were undertaken with intent to harm, as required for a tortious interference with business relations claim. The Court therefore grants summary judgment to Plaintiffs on Count III of Defendants' counterclaim.

## VII. Counterclaim for Economic Duress[15] (Count V)

Count V alleges that Plaintiffs had "total control and dominance" over every aspect of Defendants' business, assumed fiduciary duties in line with that control, and then proceeded to defraud Defendants into acquiring additional franchises and to restrict Defendants' ability to earn profits—all with the goal of seizing and converting Defendants' stores. 2d. Am. Countercl. ¶¶ 71, 73, 74. Plaintiffs move for summary judgment on Count V.

Under Texas law, a plaintiff that seeks to prevail on a claim for economic duress must prove: (1) "a threat to do something beyond the legal right of the party

---

[15]     Count V of Defendants' counterclaim is technically a counterclaim for "economic duress and business coercion," but as the Court stated in its order on Plaintiffs' motion to dismiss Defendants' counter-claims, *see Appliance All.*, 2017 WL 839483 at *8 n.8, Defendants' allegations of business coercion are indistinguishable from their allegations of economic duress, and the parties act as if the only allegations are those of economic duress. See Defs.' Mem. at 20–22; Pls.' Mem. at 15–17. In line with the parties' approach, the Court assumes that Count V asserts a claim only for economic duress.

making the threat," (2) accompanied by an "illegal exaction or some fraud or deception," such that (3) the threatened party is imminently restrained and its free agency is destroyed without a present means of protecting itself. *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 404 (5th Cir. 2008) (quoting *Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1184–85 (5th Cir. 1993)).

According to Plaintiffs, they are entitled to summary judgment on this claim because Defendants have not produced any evidence of any threats that were not within Plaintiffs' legal right to make, of any illegal exaction, fraud, or deception, or of any restraint on Defendants' free agency. Pls.' Mem. at 15. In response, Defendants contend that courts recognize economic duress as "a valid basis for relief in many situations even where the threatened action may be allowable under a contract, but is otherwise motivated to cause harm or to cause the victim to lose the ability to exercise free will." Defs.' Mem. at 21.

But even if Texas were to recognize an economic duress claim based upon contractually permitted threats, Defendants have not pointed to any specific threats, nor identified how such threats were accompanied by an illegal exaction, fraud, or deception. *See generally* Defs.' Mem. at 20–22. The Court therefore concludes that no reasonable factfinder could find that Plaintiffs committed economic duress and grants summary judgment to Plaintiffs on Count V of Defendants' counterclaim.

## VIII. Counterclaim for Violations of the Texas Business Opportunity Act and Texas Deceptive Trade Practices Act (Count VI)

In Count VI, Defendants allege violations of the Texas Business Opportunity Act (TBOA), Tex. Bus. & Com. Code Ann. §§ 51.160, 51.301, and Texas Deceptive Trade Practices Act (DTPA), Tex. Bus. & Com. Code Ann. §§ 17.46, 17.50. According to Defendants, Plaintiffs violated these statutes by (1) failing to disclose the reality of the commissions and returns Defendants would earn; (2) failing to disclose the overall competitive structure in which Defendants would operate, including the control exerted by Plaintiffs over Defendants' profits; and (3) misrepresenting that Plaintiffs intended to pay Defendants the 2% marketing fee. 2d. Am. Countercl. ¶¶ 79, 83.

Plaintiffs move for summary judgment as to these statutory claims on the basis that the undisputed evidence demonstrates that Defendants agreed to contractual terms which address each of these issues and that the statute of limitations has expired for these claims. Pls.' Mem. at 18–19. Defendants do not respond to any of Plaintiffs' arguments. *See* Defs.' Mem. at 12–16.

The DTPA provides that a consumer may maintain an action where the consumer has sustained damages by a person's use or employment of a "false, misleading, or deceptive act or practice." Tex. Bus. & Com. Code Ann. § 17.50. Similarly, the TBOA prohibits a seller from "mak[ing] an untrue statement of a material fact or omit[ting] to state a material fact in connection with the documents and information required to be provided to the secretary of state or purchaser," or "represent[ing] that the business opportunity provides or will provide income or

earning potential" unless the seller has documented data to substantiate that representation and discloses such data at the time of the representation. Tex. Bus. & Com. Code Ann. § 15.301.

As for Plaintiffs' first argument, it is undisputed that Defendants signed documents that disclosed that they would be subject to competition from other Sears entities, *see* Agreements § 1.C; SHAS LR Stmt. ¶ 10 (describing the FDD), and that the commissions varied but would never go below 9.25%, *see* Agreements § 2.B(1). Additionally, it is undisputed that Defendants negotiated an amendment to the Agreements that included a provision that Plaintiffs could opt to not provide the marketing allowance at all after the two years, *see* SHAS LR Stmt. ¶ 32. The undisputed evidence therefore demonstrates that Plaintiffs neither omitted material information nor misrepresented that they intended to pay Defendants a marketing fee.

Turley also claims that a Sears representative told Defendants in 2010, prior to the execution of the Agreements, that commissions actually averaged 12.5%. *See* Turley Decl. ¶ 2. Actions brought under the TBOA and DTPA "'must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.'" *Armstrong v. Curves Int'l, Inc.*, No. 4:15CV1006 TCM, 2015 WL 6085553, at *12 (E.D. Mo. Oct. 15, 2015) (citing Tex. Bus. & Comm. Code § 17.565). Defendants' average annual commission in 2011 for

its four stores were as follows: 10.83%, 9.98%, 10.33%, and 11.3%.  *See* SHAS LR Stmt.  ¶  47.    Therefore,  to  the  extent  that  there  may  have  been  any misrepresentation of commission rates, Defendants would have been on notice of this  by  2012,  when  Defendants  knew  that  their  2011  commission  rates  were significantly below 12.5%.  The statute of limitations on this claim therefore expired in 2014, a year before this suit was filed.

Because  the  undisputed  evidence  demonstrates  that  Defendants  agreed  to contractual terms that disclosed the guaranteed rate of commissions, competition from  other  Sears  entities,  and  the  possibility  that  Plaintiffs  would  not  pay  the marketing fee to Defendants, and because the statute of limitations has expired as to any misrepresentation related to anticipated commission rates, the Court grants summary judgment to Plaintiffs as to Count VI of Defendants' counterclaim.

## IX.    Counterclaim for Unfair Competition (Count IV)

Plaintiffs also move for summary judgment as to Defendants' claim for unfair competition.    Under Texas law, the tort of unfair competition is recognized as a derivative tort that encompasses "all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters."  *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000)  (quotation  marks  and  citation  omitted).    To  prove  a  claim  of  unfair competition, therefore, Defendants must prove an underlying cause of action giving rise to their allegations of unfair competition.  Because the Court has already found that Defendants either waived or failed to adduce evidence supporting any of their counterclaims, Defendants' claim for unfair competition must also fail because they

cannot prove an underlying cause of action. The Court therefore grants summary judgment to Plaintiffs as to the unfair competition claim in Count IV of Defendants' counterclaim.

As the Court has granted summary judgment to Plaintiffs on all of Defendants' counterclaims, the Court declines to reach the additional arguments advanced by Wilks, Sears Holding, and Sears Roebuck, as to why summary judgment should be granted as to them specifically. The Court also declines to reach Count IV of Plaintiff's Complaint, which asserts that Plaintiffs are entitled to attorneys' fees under the Agreements and the promissory notes, as these issues may require further factual development as the case proceeds on the issue of damages.

## Conclusion

For the reasons stated herein, the Court grants in full Wilks' [103] and Sears Holding and Sears Roebuck's [109] motions for summary judgment. The Court grants in part and denies in part SHAS, SAHS, and SHO's motion for summary judgment [105]. The Court grants the motion as to all of the counterclaims asserted in Defendants' Second Amended Counterclaim, as well as to Counts I and II of Plaintiffs' Complaint. The Court further grants summary judgment as to Plaintiffs' claim in Count III that it properly terminated Defendants and declares that Sears Home Appliance Showroom properly terminated the Franchise Agreements with Appliance Alliance. The Court denies summary judgment as to Count IV of the Complaint, as well as to Plaintiffs' claim for declaratory judgment in Count III relating to the Texas action. No claims remain against Counter-Defendants Wilks,

Sears Roebuck, SHO, and Sears Holding, so those parties are dismissed. The remaining parties—Plaintiffs Sears Home Appliances Showrooms and Sears Authorized Home Stores, and Defendants Appliance Alliance, LLC, Brent Turley, and Minena Turley—should prepare to discuss how to address damages at the next status hearing, which the Court sets for 7/18/18 at 9:15 a.m.

**IT IS SO ORDERED.**     **ENTERED   6/29/18**

_____
**John Z. Lee**
**United States District Judge**